IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 20, 2020 Session

## WILLIAM L. KELLERMAN ET AL. V. GERALD S. GABRIEL ET AL.

**Appeal from the Chancery Court for Cannon County**
**No. 17-100    Darrell L. Scarlett, Chancellor**

### No. M2019-01893-COA-R3-CV

This appeal arises out of a boundary dispute. Following a bench trial, the court determined that the plaintiffs established the boundary line based on an oral boundary agreement between the parties' predecessors in interest. On appeal, the defendant takes issue with the trial court's finding that the parties to the oral boundary agreement were uncertain of the location of the original boundary at the time they entered into the agreement. The defendant also takes issue with the trial court's determination that the plaintiffs' deed was not void for champerty based on the court's conclusion that the remnants of the fence the defendant relied on to establish the property line met none of the requirements of adverse possession. After reviewing the evidence presented at the trial, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Jerry E. Farmer, Murfreesboro, Tennessee, for the appellant, Gerald S. Gabriel.

Nathan S. Luna, Murfreesboro, Tennessee, for the appellees, William Kellerman and Peggy Kellerman.

Matthew D. Cowen, Woodbury, Tennessee, for the appellees, Donald Kellerman and Diana Kellerman.

Margie Rigsby Miller, McMinnville, Tennessee, for the appellees, Jesse W. Ferrell and Connie Jean Ferrell.

Shaun Hill and Edyta Hill, Woodbury, Tennessee, Pro se.

# OPINION

On May 15, 2017, the plaintiffs, William L. Kellerman, Peggy L. Kellerman, Donald W. Kellerman, and Diana Kellerman ("the Kellermans"), filed a Complaint to Quiet Title in the Chancery Court for Cannon County to resolve a boundary dispute with the defendant, Gerald S. Gabriel ("Mr. Gabriel"). Plaintiffs also filed a motion for a temporary injunction to require Mr. Gabriel to replace fence posts and signs he removed from the disputed property. On May 22, 2017, the court entered an Agreed Order restraining Mr. Gabriel from going onto the disputed property pending further orders.

The property in dispute consists of approximately five acres that had been part of a 32-acre tract purchased by Kenneth Gassaway in 1968. Mr. Gabriel contends the true boundary was established in 1979 in his chain of title and identified by natural landmarks. The Kellermans contend the boundary was established in 1992 by way of an oral agreement between the Kellermans' and Mr. Gabriel's predecessors in interest.

In 1979, Kenneth Gassaway conveyed the eastern half of his 32-acre tract to his son, Albert Gassaway, (Mr. Gabriel's predecessor in interest) describing the boundary between the eastern and western tracts as running "from the middle of a spring branch in DeBerry's line on the South then North in line with a double oak tree and a maple tree to the Chumbley Hollow Road on the North." The conveyance was subject to a deed of trust.

In 1983, Kenneth Gassaway conveyed the western half of the tract to Jesse W. Ferrell and his wife, Connie Jean Ferrell, (the Kellermans' predecessors in interest) describing it in the deed as "16 acres, more or less" and "bounded on the EAST by the lands of Albert Gassaway."

Kenneth Gassaway foreclosed on Albert's eastern tract and, in 1988, sold 15 acres of the 16-acre tract to Richard Horn and his wife, Srichand Horn.[1] Like the 1979 deed to Albert Gassaway, the Gassaway-Horn deed described the western boundary as running "from the middle of a spring branch in DeBerry's line on the SOUTH then NORTH in line with a double oak tree and a maple tree to the Chumbley Hollow Road on the NORTH" (hereinafter, "the original boundary").

The Ferrells and the Horns were neighbors for approximately five years, with the Ferrells owning the western tract and the Horns owning the eastern tract. Around 1992, Mr. Ferrell and Mr. Horn orally agreed to fix the boundary between the two tracts and to mark the boundary with a fence ("oral boundary"). Although Mr. Horn marked the agreed-upon boundary with fence posts, he never constructed the fence.

---

[1] The one-acre Kenneth Gassaway retained is not pertinent to this dispute.

In 1993, the Ferrells conveyed approximately seven acres along the oral boundary to William and Peggy Kellerman, described in the deed as "bounded on the EAST by the Richard and Srichand Horn realty, this East line being a newly constructed partnership wire fence," and containing "7 acres, more or less, by estimation." In 2004, William and Peggy Kellerman conveyed a portion of their seven-acre tract to their son and his wife, Donald and Diana Kellerman.

William and Peggy Kellerman and the Horns were neighbors until 1996 when the Horns conveyed their entire tract to Melissa Elkins. On June 29, 2012, Ms. Elkins conveyed the tract to Mr. Gabriel. Mr. Gabriel's deed described the property as "containing 15 acres, more or less by estimation" and "bounded on the West by the William and Peggy Kellerman realty."

Shaun and Edyta Hill purchased a 20-acre tract once owned by the Ferrells, a portion of which was within the disputed area. The Hills' tract included a corner of the western tract located along the southern portion of the oral boundary line.

The dispute at issue here arose in 2017 after the Kellermans planted trees on their side of the oral boundary. Believing the trees were planted on his property, Mr. Gabriel removed the fence posts Mr. Horn erected in 1992. Shortly thereafter, the Kellermans commenced this action to quiet title in which they alleged that Mr. Gabriel wrongfully claimed ownership of approximately 2.5 acres of property owned by the Kellermans and located on the Kellermans' side of the boundary line described in the Kellermans' deed, i.e., the oral boundary.

Mr. Gabriel timely filed an answer and counterclaims, which he amended in May 2018. Mr. Gabriel alleged that the true boundary was the boundary identified by Roberts Land Surveying, a company hired by Mr. Gabriel. Mr. Gabriel claimed the oral boundary agreement between Mr. Ferrell and Mr. Horn violated the statute of frauds and the rule against hearsay. Mr. Gabriel also filed a third-party complaint against the Ferrells and the Hills contending the deeds in their respective chains of title were champertous and, thus, void. The champerty claims were based on the allegations that Mr. Gabriel and/or his predecessors in interest adversely possessed the disputed property at the time of the Ferrells' conveyance to the Kellermans and, similarly, at the time of the Ferrells' conveyance to the Hills' predecessors in title.

The Kellermans, the Ferrells, and the Hills each filed answers denying Mr. Gabriel's allegations.

The court held a four-day bench trial in August 2019, during which numerous witnesses testified, including Mr. Ferrell, Mr. Gabriel, David Gilley[2], who is a predecessor in interest to Mr. Gabriel, and three surveyors, each retained by a different party. At the conclusion of the trial, the court held that there was a valid oral boundary agreement and entered judgment in favor of the Kellermans, Ferrells, and Hills. In making its determination, the court considered each of the four essential factors set forth in *Jack v. Dillehay*, 194 S.W.3d 441, 447–448 (Tenn. Ct. App. 2005):

> 1) whether there is a dispute or uncertainty as to the true location of the original boundary line; 2) the agreement, if any, of the predecessors in interest to the location of the claimed boundary; 3) whether the boundary line established by the oral agreement is definite and certain; and 4) whether possession and use of the property up to the agreed boundary line, or acquiescence in the same, [has] been exhibited by the parties or their predecessors in interest.

The court found that each factor was established. As for factor one, which is the primary focus of Mr. Gabriel's challenge, the court found that the location of the original boundary was uncertain at the time Mr. Ferrell and Mr. Horn entered into the oral boundary agreement because, *inter alia*, the three surveyors could not agree on the location of the original boundary. And, as the court explained,

> Mr. Jesse Ferrell, whose testimony the Court accredits, testified he did not know the exact location of the original boundary line but knew the general direction the line extended. He continued further by stating it was his belief there were only three (3) people living who would know the direction of the original line. Mr. Ferrell did not know which trees were referred to in prior deeds, with the exception of the Maple tree at the northernmost point of the boundary line. This location is not disputed by any party hereto.

With regard to the third factor, the court found that the location of the oral boundary was certain based on the testimony of the surveyors and other witnesses who agreed on its location. The court stated:

> Mr. Ferrell testified that once that boundary line was established between he and Mr. Horn in 1992, both he and Mr. Horn abided by the agreement. Further, David Gilley who is a predecessor in title to Gabriel, testified he abided by the agreed upon property line. It appears from the proof there was

---

[2] In 2002, David Gilley married Melissa Elkins while she owned the property that Mr. Gabriel now owns. Mr. Gilley lived on the property with his wife from 2002 until 2012, during which time she signed a quitclaim deed to create a tenancy by the entirety with David Gilley. They divorced, at which time Mr. Gilley conveyed all of his interest in the property to Ms. Elkins.

no deviation from this agreement until shortly before Mr. Gabriel's March 30, 2017 letter marked Exhibit 4. Thus, the Court finds Plaintiffs have satisfied the fourth requirement necessary to establish the existence of an oral boundary agreement.

Having determined that an oral boundary was properly established, the court turned its attention to Mr. Gabriel's claims of adverse possession and champerty, which were based, in part, on a remnant of a wire fence in the disputed area. The court found:

There was no testimony supporting the remnant of the fence purported to, or even attempted to, assert ownership to the disputed area. In fact, no such claim was made. The only claim presented was that the remnant of the fence did, in fact, exist in a portion of the disputed area and that the fence ran for a short distance north and south but did not enclose. Further, this fence remnant is at the southern end of the property and is very hilly and wooded and in no way indicates adverse possession. A claim for adverse possession, among other things, must be open, continuous, and notorious. The proof in this case overwhelmingly shows the fence remnant meets none of those requirements. Accordingly, this claim is without merit.

Having determined that Mr. Gabriel failed to prove adverse possession, the court concluded that the Kellermans' and the Hills' deeds were not champertous.

This appeal followed.

## STANDARD OF REVIEW

"In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006). Our review of a trial court's determinations on issues of law is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

## ANALYSIS

Mr. Gabriel raises two issues on appeal:

(1) Did Messrs. Ferrell and Horn enter into a valid and enforceable oral boundary agreement and

(2) Was the Kellermans' deed void as champertous based on the existence of a fence remnant in the disputed area?

The Kellermans and the Ferrells contend they are entitled to their attorneys' fees for a frivolous appeal in accordance with Tenn. Code Ann. § 27-1-122.

We will consider each issue in turn.

## I. ORAL BOUNDARY AGREEMENT

Mr. Gabriel's principal argument at the trial and on appeal is that the evidence preponderates against a finding that the original boundary line was uncertain at the time of the oral agreement. He contends the evidence showed Mr. Ferrell and Mr. Horn knew the location of the original boundary and orally agreed to change the boundary to facilitate an exchange of property. The Kellermans, Ferrells, and Hills disagree, contending the preponderance of the evidence supports the trial court's determination that Messrs. Ferrell and Horn did not know the location of the original boundary at the time of the oral agreement.

In Tennessee, adjoining landowners may establish a boundary between their properties by oral agreement when they are uncertain as to the location of the original boundary. *Jack*, 194 S.W.3d at 447. To establish a valid oral boundary agreement, the proponent must show that (1) the true location of the original boundary was disputed or uncertain, (2) the parties or their predecessors in interest orally agreed to the location of the boundary, (3) the parties to the agreement established a definite and certain boundary, and (4) the parties and/or their predecessors in interest abided by the agreed-upon boundary. *Id*. at 447–448.

The trial court credited and relied on Mr. Ferrell's testimony regarding the details of and circumstances surrounding the oral boundary agreement. According to Mr. Ferrell, when Kenneth Gassaway conveyed the western tract to him, Mr. Gassaway pointed in the direction of the original boundary starting from the maple tree at the front of Mr. Ferrell's house on Chumbley Road; however, Mr. Ferrell was unclear as to the location of the double oak tree and beyond:

> I knew -- I can definitely say I knew the direction, but like I told you, trees and stuff like that -- there was like two or three oaks. There's some poplar down through there. So that's -- when I bought the property, I was standing in front of the house, and I looked at -- me, my brother-in-law, and Mr. Gassaway said, the line went -- and he pointed to the left, and there was a

double oak, double maple, double whatever that was down there and he says,
Do you see that? I said, Yes. That's the way the line went.

Mr. Ferrell drew a rough sketch of his property indicating the direction of the original boundary by starting at the maple tree on Chumbley Road and drawing a diagonal line that ran to the left. He then indicated the location of the oral boundary by starting slightly to the left of the maple tree and drawing a line that ran directly south, intersecting the original line near Chumbley Road. Based on the general location and direction of the original line and the location and direction of the oral boundary, Mr. Ferrell testified that he believed the oral boundary agreement gave Mr. Horn slightly more land in the back and gave him slightly more road frontage. Thus, Mr. Ferrell knew the general direction of the original line, but he was unsure of its exact location.[3]

Mr. Ferrell also testified that, in 1992 or 1993, Mr. Horn met with him "to straighten up the line," and, after orally agreeing to the boundary, Mr. Horn erected fence posts to mark its location; however, as noted earlier, Mr. Horn never completed the fence.

Three surveyors testified—Nicholas Northcutt, hired by the Kellermans; Michael Moore, hired by the Ferrells; and Michael Roberts, hired by Mr. Gabriel. Mr. Northcutt and Mr. Moore were unable to identify the original boundary; Mr. Roberts believed he found it. Significantly, while the location of the maple tree was undisputed, the surveyors had differing opinions concerning the definitions and locations of the double oak and spring branch.

Mr. Northcutt testified that "double oak" could mean "a forked oak, it could mean a twin, it could mean the trunk comes up so far and then there's two large trees." Mr. Northcutt testified, "I never found anything down in that area that would have jumped out at me particularly as being the tree that they were calling for." Mr. Roberts testified that a double oak was simply "twin trees attached at the base," and he was able to find it.

The surveyors also failed to agree on the definition of "spring branch." Mr. Northcutt testified that "spring branch" could refer to Shanborne or Shanborne Branch, or could refer "to a smaller tributary that would dump into that creek." Mr. Moore testified that a spring branch was "a branched body of water that is fed by underground springs." And Mr. Roberts described a spring branch as "a stream or outflow of a spring flowing into a nearby primary stream." In sum, aside from the maple tree, all three surveyors disputed the meaning and the location of the key reference points forming the original boundary.

Mr. Gabriel argues that Mr. Ferrell's testimony that he believed Mr. Horn received more land and Mr. Ferrell received more road frontage strongly indicated that Mr. Ferrell knew the location of the original boundary. However, we found Mr. Ferrell's testimony to

---

[3] Mr. Ferrell testified by deposition, which was entered into evidence.

be merely speculative and not evidence that he knew the location of the original line. Mr. Ferrell consistently testified that he knew the general direction of the line, which he demonstrated on his sketch, but he did not know its precise location. Mr. Northcutt's testimony, in particular, was consistent with Mr. Ferrell's, in that, he also could not locate the double oak, and all three surveyors disagreed on the meaning of "spring branch." As this court once opined, "[b]oundaries are not well marked, memories fade, landmarks disappear or are very hard to identify." *Lay v. Holmes*, No. M2007-01978-COA-R3-CV, 2008 WL 3452301, at *6 (Tenn. Ct. App. Aug. 12, 2008). Based on the foregoing, we have determined that the evidence does not preponderate against the trial court's finding of fact that the original boundary was uncertain at the time of the oral boundary agreement.

As for the other *Jack* factors, the testimony supports the trial court's findings that the agreed-upon location of the oral boundary was certain and the landowners adhered to it after it was established. Mr. Ferrell, Mr. Northcutt, Mr. Moore, Peggy Kellerman, and David Gilley testified to the precise location of the oral boundary. Peggy Kellerman further testified that the Horns, Ms. Elkins, and Mr. Gilley adhered to the oral boundary. Mr. Gilley testified that he lived on the eastern tract after he and Ms. Elkins married from approximately 2002 to 2012, and, in those 10 years, he understood that the boundary between his property and the Kellermans' property was the oral boundary marked with fence posts.

Thus, having determined that the preponderance of the evidence established all four *Jack* factors, we affirm the trial court's determination that the oral boundary agreement was valid and enforceable.

## II. CHAMPERTY

Mr. Gabriel's claim that the Kellermans' deed is void for champerty is premised on the existence of a wire fence remnant in the disputed area and his contention that the Horns adversely possessed the disputed area at the time of the Ferrells' conveyance to the Kellermans. The Kellermans and Ferrells argue that there is no evidence of adverse possession, and therefore, the champerty claim fails.

In Tennessee, a deed is void for champerty when the seller is not in actual possession of the property at the time of the conveyance. *Foust v. Metcalf*, 338 S.W.3d 457, 463 (Tenn. Ct. App. 2010) (citing Tenn. Code Ann. § 66-4-202). As this court explained,

> no particular length of adverse possession is necessary to render a deed void as champertous; it is sufficient that "the land was being adversely held at the time of the conveyance." Thus, adverse possession in the champerty context is unlike a claim of adverse possession under Tenn. Code Ann. § 28–2–105, which requires seven years of possession under color of title that has been registered for thirty years, and unlike a claim of adverse possession under the

common law, which requires twenty years of possession without color of title. To render a deed void as champertous, the adverse party claiming under color of title need only be in possession of the disputed property "at the time of the conveyance."

*Foust*, 338 S.W.3d at 464 (citations and footnotes omitted). However, like any adverse possession claim, the proponent must prove that, at the time of the conveyance, the possession was "exclusive, actual, adverse, continuous, open and notorious." *Id*. (quoting *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005)).

Generally, a fence "is considered very decisive in determining possession and claim of ownership;" however, it is not a foregone conclusion in every case. *Cusik v. Cutshaw*, 237 S.W.2d 563, 567 (Tenn. 1948) (citations omitted). It depends, in part, on the condition of the fence, who erected it, and for what purpose. *Lafever v. Lafever*, No. M2008-00651-R3-CV, 2009 WL 167329, at *12 (Tenn. Ct. App. Jan. 23, 2009).

In *Lusk v. Englett*, for example, we found that a fence did not indicate adverse possession when the adverse claimant did not erect the fence and the evidence showed that the fence was not intended as a boundary. No. M1999-00294-COA-R3-CV, 2000 WL 382082, at *2 (Tenn. Ct. App. Apr. 17, 2000). And, in *Lafever*, this court found that a fence did not indicate a clear claim of ownership because, in part, the fence was in such poor condition it "would not keep animals in or out of the disputed area." 2009 WL 167329, at *12; *see Cusick*, 237 S.W.2d at 567 (The adverse possession claim failed because "[t]he fencing shown to have existed on the lands in question here appears to have been unsubstantial if not actually inconsequential.").

The trial court determined that the fence remnant did not "purport[] to, or even attempt[] to, assert ownership to the disputed area," and we have determined that the evidence does not preponderate against this finding.

There was very little testimony regarding the fence. Surveyor, Michael Roberts, testified that the fence was "parallel to the creek running east-west." He further testified that the fence did not enclose, and it was "broken and falling apart, and so quite old." Robert McAllister, a neighbor, testified that "there were remnants [of the fence] laying on the ground . . . at the spring branch…. I don't know how long ago it was put there." There was no evidence indicating who constructed the fence, when it was constructed, or its purpose—only evidence of its extremely poor condition. And, significantly, there was no testimony as to the condition of the fence at the time of the Ferrells' conveyance to the Kellermans, which was key to Mr. Gabriel's champerty claim. A fence that is "broken and falling apart" does not establish any of the elements necessary for adverse possession.

Because Mr. Gabriel failed to prove that the Horns adversely possessed the area in dispute at the time of the Ferrells' conveyance to the Kellermans, we affirm the trial court's determination that the Kellermans' deed was not champertous.

## III. FRIVOLOUS APPEAL

The Ferrells and Kellermans argue they are entitled to attorney's fees for a frivolous appeal.

"[T]he Tennessee General Assembly enacted Tenn. Code Ann. § 27–1–122 to enable appellate courts to award damages against parties whose appeals are frivolous or are brought solely for the purpose of delay." *Young v. Barrow*, 130 S.W.3d 59, 66 (Tenn. Ct. App. 2003). The decision to award these damages is a discretionary decision. *Id.* at 66–67 (citing *Banks v. St. Francis Hosp.,* 697 S.W.2d 340, 343 (Tenn. 1985)).

Tenn. Code Ann. § 27-1-122 provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

"This statute 'must be interpreted and applied strictly so as not to discourage legitimate appeals.'" *Wakefield v. Longmire*, 54 S.W.3d 300, 304 (Tenn. Ct. App. 2001) (quoting *Davis v. Gulf Ins. Grp.,* 546 S.W.2d 583, 586 (Tenn.1977)). "A frivolous appeal is one that is devoid of merit, *Combustion Eng'g, Inc. v. Kennedy,* 562 S.W.2d 202, 205 (Tenn. 1978), or one that has no reasonable chance of succeeding." *Young*, 130 S.W.3d at 67 (citing *Davis,* 546 S.W.2d at 586; *Jackson v. Aldridge,* 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999); *Industrial Dev. Bd. v. Hancock,* 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995)).

We have determined that, though Mr. Gabriel was not successful on appeal, his appeal was not devoid of merit; therefore, we decline to award damages under § 27-1-122.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Gerald S. Gabriel.

_____
FRANK G. CLEMENT JR., P.J., M.S.